# In the
# United States Court of Appeals
# For the Second Circuit

August Term, 2025

(Argued: March 20, 2026 Decided: October 20, 2026)

Docket No. 25-2095

JAMES SEABROOK, on his own behalf and on behalf of others similarly situated,

*Plaintiff-Appellant*,

–v.–

CITY OF NEW YORK, LYNELLE MAGINLEY-LIDDLE, LOUIS MOLINA, VINCENT SCHIRALDI, CYNTHIA BRANN, RONALD BRERETON, ANTHONY MONASTERO,

*Defendants-Appellees*.

Before: LEE and ROBINSON, *Circuit Judges*, KOMITEE, *District Judge*.*

When the district court sentenced Plaintiff-Appellant James Seabrook to an indeterminate sentence of three and one-half to seven years, he had already spent over seven and a half years in pre-trial detention—more time than his maximum potential sentence. Nevertheless, the City of New York (the "City") held him in custody at Rikers Island for seventeen days after his sentencing, awaiting his transfer from the New York City Department of Correction ("DOC") to the New

* Judge Eric R. Komitee of the United States District Court for the Eastern District of New York, sitting by designation.

York State Department of Corrections and Community Supervision ("DOCCS") before he could be released. All parties agree that Seabrook was thus detained past his maximum sentence.

As a result of his over-detention, Seabrook sued the City and various officials pursuant to 42 U.S.C. § 1983. He brought putative class action claims alleging he had been subjected to cruel and unusual punishment under the Eighth Amendment and had been denied due process under the Fourteenth Amendment. Seabrook now appeals from a judgment of the United States District Court for the Southern District of New York (Castel, *J.*) dismissing his claims. *See Seabrook v. City of New York*, No. 24-cv-2029, 2025 WL 2223028 (S.D.N.Y. Aug. 4, 2025). On appeal, he challenges the district court's dismissal of his claims against the City and one individual defendant, DOC Captain Anthony Monastero.

Because DOC allegedly failed to exercise its discretion to 1) seek immediate authorization from DOCCS to release Seabrook rather than awaiting a physical transfer and 2) establish an expedited process to secure immediate review for individuals confined past their maximum sentence, we VACATE and REMAND.

---

ALICE G. REITER (Eric J. Hecker, *on the brief*), Wang Hecker LLP, New York, NY, *for Plaintiff-Appellant*.

JAMISON DAVIES (Richard Dearing, Jeremy W. Shweder, *on the brief*), *for* Muriel Goode-Trufant, Corporation Counsel of the City of New York, New York, NY, *for Defendants-Appellees*.

---

ROBINSON, *Circuit Judge*:

When the district court sentenced Plaintiff-Appellant James Seabrook to an indeterminate sentence of three and one-half to seven years, he had already spent over seven and a half years in pre-trial detention—more time than his maximum potential sentence. Nevertheless, the City of New York (the "City") held him in custody at Rikers Island for seventeen days after his sentencing, awaiting his

transfer from the New York City Department of Correction ("DOC") to the New York State Department of Corrections and Community Supervision ("DOCCS") before he could be released. All parties agree that Seabrook was thus detained past his maximum sentence.

As a result of his over-detention, Seabrook sued the City and various officials pursuant to 42 U.S.C. § 1983. He brought putative class action claims alleging he had been subjected to cruel and unusual punishment under the Eighth Amendment and had been denied due process under the Fourteenth Amendment. Seabrook now appeals from a judgment of the United States District Court for the Southern District of New York (Castel, *J.*) dismissing his claims. *See Seabrook v. City of New York*, No. 24-cv-2029, 2025 WL 2223028 (S.D.N.Y. Aug. 4, 2025). On appeal, he challenges the district court's dismissal of his claims against the City and one individual defendant, DOC Captain Anthony Monastero.

For the reasons set forth below, we **VACATE** and **REMAND**.

## BACKGROUND[1]

Seabrook was arrested and charged with six crimes in May 2016. He was convicted of criminal possession of a weapon in April 2019, but the jury hung on the more serious charged offenses. He was retried on those charges in 2022, and the jury hung again. Following a third trial, a jury acquitted him of the remaining charges in December 2023. From May 2016 through December 2023—more than seven and a half years—Seabrook was held in pre-trial custody by DOC. On December 13, 2023, after he was acquitted of the more serious charges, Seabrook was released from custody pending his sentencing on the charge of criminal possession of a weapon.

On January 31, 2024, the trial court sentenced Seabrook to an indeterminate sentence of three and a half to seven years for the 2019 criminal possession conviction. At sentencing, all parties acknowledged that Seabrook had already served more time than his maximum sentence, but he nevertheless was remanded to custody. In the sentencing order, the court checked a checkbox that stated:

> THE SAID DEFENDANT BE AND HEREBY IS COMMITTED TO THE CUSTODY OF THE [DOCCS] until released in accordance with

[1] We draw our factual account from the complaint's allegations and the state court's sentencing order, which is incorporated by reference in the complaint. *See Marcus & Cinelli, LLP v. Aspen Am. Ins. Co.*, 158 F.4th 333, 337 n.2 (2d Cir. 2025) (explaining that in reviewing a district court's grant of a motion to dismiss, "[o]ur review is generally limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference") (internal quotations omitted).

> the law, and being a person sixteen (16) years or older not presently in the custody of [DOCCS]. [DOC] is directed to deliver the defendant to the custody of [DOCCS] as provided in 7 NYCRR Part 103.[2]

App'x 37. Seabrook was thus remanded to DOC that day so that he could be transferred to DOCCS custody and then released.

Once Seabrook was back in custody, his counsel notified DOC officials that he was being detained in excess of his sentence. More than a week later, on February 9, 2024, his counsel contacted the DOC's Office of General Counsel and was told that Seabrook was "awaiting transfer to state custody," and that "[o]nce he goes upstate his time will be calculated there" because "DOC does not calculate state sentences." App'x 22.

On February 16, Seabrook's counsel again contacted the DOC Office of the General Counsel and sent a separate message to a DOC Warden. That same day, the Warden responded and copied members of the DOC Custody Management Unit, including DOC Captain Anthony Monastero, the head of the Custody Management Unit. The Warden stated that members of the Custody Management Unit had been attempting to "expedite" Seabrook's transfer to DOCCS custody, but their efforts had been "to no avail." App'x 23. Monastero also responded that

[2] Title 7, Part 103 of the New York Codes, Rules and Regulations designates the DOCCS institution to which defendants will be committed based on their age and gender. *See* 7 NYCRR 103.1–103.15.

day and explained that they were waiting for DOCCS, because DOC could "neither release him nor transfer him to State DOCCS custody without their authorization." *Id.* Later that day—still February 16, 2024—Seabrook was released from DOC custody without being transferred to DOCCS.

Pursuant to 42 U.S.C. § 1983, Seabrook sued the City, as the body responsible for DOC, and several individuals who serve as officers of DOC, including Monastero, alleging violations of the Fourth, Eighth, and Fourteenth Amendments. Defendants moved to dismiss, arguing that any harm was caused by the state court's sentencing order and not DOC actions. They also argued that the complaint failed to adequately allege the individual defendants' involvement and that they were entitled to qualified immunity regardless; that there were insufficient allegations of deliberate indifference under the Eighth Amendment; that the Fourth Amendment does not apply to post-conviction claims; that there were no allegations of conscience-shocking behavior to support a substantive due process claim; and that there was no deprivation of a liberty interest or insufficient procedures that would allow a procedural due process claim. Defendants also argued that, although Seabrook named the City as a defendant, he made no specific claims of municipal liability and could not allege an unconstitutional City policy or practice.

The district court granted the motion in full. As relevant to this appeal, the court held that the Eighth Amendment claim failed because the complaint did not adequately plead that any individual defendant had acted with deliberate indifference nor that DOC had sufficient discretion pursuant to the regulatory scheme to create a City policy or practice leading to Seabrook's excessive detention. The court held that the Fourteenth Amendment procedural due process claim failed both because the complaint did not allege interference with a cognizable liberty interest and because it did not sufficiently allege that Seabrook lacked an opportunity to be heard or that additional procedural protections were warranted under *Mathews v. Eldridge*, 424 U.S. 319 (1976).[3]

## DISCUSSION

The Court "review[s] the grant of a motion to dismiss under Rule 12(b)(6) without deference to the district court's reasoning." *Marcus & Cinelli, LLP v. Aspen American Insurance Company*, 158 F.4th 333, 340 (2d Cir. 2025).[4] "If, accepting all factual allegations in the complaint as true and drawing all reasonable inferences

[3] On appeal, Seabrook "accepts the District Court's dismissal of his claims against the individual Defendants other than Defendant Monastero, and Plaintiff accepts the District Court's dismissal of his Fourth Amendment and substantive due process claims." Appellant's Br. at 5 n.1.

[4] In quotations from caselaw, this opinion omits all internal quotation marks, footnotes, and citations, and accepts all alterations, unless otherwise noted.

in favor of the plaintiff, the complaint fails to plausibly state a claim, then dismissal under Rule 12(b)(6) is warranted." *Id.*

On appeal Seabrook emphasizes his allegations that DOC has an unconstitutional practice of imprisoning people in excess of their maximum sentences. That practice allegedly arises from the City's policy of requiring that a person be transferred to DOCCS custody prior to their release and the absence of any DOC process for individuals who have exceeded their maximum sentence to seek expedited review.

As discussed below, although the City may have lacked the discretion to unilaterally release Seabrook without DOCCS's authorization, the complaint adequately alleges both that the City and Monastero failed to exercise their discretion to prevent Seabrook's excessive detention and that the lack of additional procedures to prevent Seabrook's excessive detention deprived him of a liberty interest and denied him due process.

## I. Eighth Amendment

The Eighth Amendment provides that "cruel and unusual punishments" shall not be "inflicted." U.S. Const. amend. VIII. The Eighth Amendment prohibits "the unnecessary and wanton infliction of pain," including punishments that are "totally without penological justification." *Gregg v. Georgia*, 428 U.S. 153,

173, 183 (1976). As we have explained, "[t]here is no penological justification for incarceration beyond a mandatory release date because any deterrent and retributive purposes served by the inmate's time in jail were fulfilled as of that date." *Hurd v. Fredenburgh*, 984 F.3d 1075, 1085 (2d Cir. 2021).

Seabrook argues that his seventeen-day, post-sentencing incarceration at Rikers violated the Eighth Amendment because he had already served more than his maximum seven-year sentence due to the seven and a half years he spent in pre-trial detention. The district court held that, despite the fact that Seabrook's detention lacked a penological justification, the complaint failed to adequately allege that the City had a policy or practice that led to the excessive detention or that Monastero acted with deliberate indifference, and thus the complaint failed to state a claim. *See Seabrook*, 2025 WL 2223028, at *6–8, *11. For the following reasons, we disagree.

*A.* Monell *Claim*

To adequately allege a claim against the City pursuant to 42 U.S.C. § 1983, Seabrook must allege that the City had an unconstitutional policy or practice under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). *See Lucente v. County of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020) (explaining that municipal liability under § 1983 requires "(1) an official policy or custom that

(2) causes the plaintiff to be subjected to (3) a denial of a constitutional right"). As explained above, Seabrook's detention beyond his maximum sentence violated his constitutional rights. The issue here is whether he has adequately alleged that his over-detention was caused by "an official policy or custom" of the City. *Id.*

An official policy must reflect "a course of action consciously chosen from among various alternatives." *Vives v. City of New York*, 524 F.3d 346, 350 (2d Cir. 2008). Where an alleged policy is grounded in a municipality's application and enforcement of state law, the plaintiff must demonstrate two elements: (1) "whether the municipality had a meaningful choice as to whether it would enforce the law," and if so, (2) "whether the municipality adopted a discrete policy to enforce the law that represented a conscious choice by one of its policy makers." *Juzumas v. Nassau County*, 33 F.4th 681, 688 (2d Cir. 2022).

Whether a municipality has a meaningful choice turns on the presence and extent of mandatory language within the statutes at issue and whether that language requires the policy to be enacted or enforced in the specific way that is challenged. *Id.* at 688–89. If the "policy goes beyond what state law requires," it is likely that the municipality made a meaningful choice to adopt that policy. *Id.* at 689. The question of conscious choice hinges on whether there are sufficient allegations to suggest that the municipality was aware of its options and chose an

unconstitutional policy. *See Vives*, 524 F.3d at 356 (explaining that the key question is "whether the City went beyond a general policy of enforcing" state law and instead made "a conscious choice to enforce [this law] in an unconstitutional manner").

Seabrook alleges that his over-detention resulted broadly from the City's failure to have procedures in place to prevent detention beyond a person's maximum sentence. Specifically, he alleges (1) that the City maintained a policy requiring, at least in the first instance, transfer of physical custody to DOCCS of individuals who had served their maximum sentence, and (2) that it failed to provide an expedited review process for individuals who were incarcerated in DOC facilities beyond their maximum sentence. We conclude that under *Monell*, the City could be liable on the basis of each of these alleged policies.

i. Requiring Physical Transfer

We agree with Seabrook that the City had a "meaningful choice" with respect to its alleged physical-transfer requirement, and that it made a "conscious choice" to maintain such a policy. *Juzumas*, 33 F.4th at 688.

As to the "meaningful choice" prong of the analysis, the statutory scheme requires that a prisoner be committed to DOCCS custody at sentencing, N.Y. Penal Law § 70.20(1), and, if the defendant is in the custody of DOC at sentencing, that

DOC "deliver the defendant forthwith to the proper institution in accordance with the commitment" to DOCCS, N.Y. Criminal Procedure Law § 430.30. Only once "the prisoner is received in an institution under the jurisdiction of" DOCCS will the sentence commence. N.Y. Penal Law § 70.30(1). A defendant who has served time in custody prior to sentencing will have that time credited against the sentenced term, and that calculation "shall be calculated from the date custody under the charge commenced to the date the sentence commences." *Id.* § 70.30(3). The state court's sentencing order followed this statutory scheme insofar as it "committed" Seabrook to DOCCS's custody and directed DOC "to deliver the defendant to the custody of [DOCCS]." App'x 37. Read together, the statutory framework means that DOC had an obligation to "deliver" Seabrook to DOCCS custody, and that once Seabrook was in DOCCS custody, his sentence would commence and DOCCS could calculate his credited time and release him.

What the framework does not do is require that DOC physically transfer an individual to a DOCCS institution to satisfy the statutory requirement that DOC "deliver" an individual into DOCCS "custody" for the purpose of sentence calculation and release. Under New York State's bipartite corrections system, an individual may remain in the "physical custody" of City correctional officers while "legal custody" resides with the State. *Uviles v. City of New York,* 130 F.4th 27, 34

(2d Cir. 2025) (quoting *Broome County v. State of New York*, 547 N.Y.S.2d 461, 461 (N.Y. App. Div. 1989)). In line with this scheme, the Sentencing and Commitment Order purported to already have "committed" Seabrook to DOCCS custody at the time of sentencing, though he remained in the physical custody of DOC. App'x 37.

While not dispositive, we further note that DOCCS, a state agency, interpreted the statutory structure to require something less than physical delivery in this case. DOCCS conducted the calculation of Seabrook's sentence and authorized his release after the Sentencing and Commitment Order committed him to DOCCS custody, but while he remained in the physical custody of DOC.

As explained in *Vives*, a meaningful choice for the purpose of the test's first prong is present where a municipality has discretion in how and whether to enforce a statute or enact a policy. *See* 524 F.3d at 354–56. There the question was whether the municipality had generalized discretion to enforce only some state laws, such that it had a meaningful choice in whether to enforce the unconstitutional state law at issue. *Id.* Although in *Vives* that question required a remand for further record development, the same analysis demonstrates that DOC has the requisite discretion here. Without a clear statutory requirement that DOC physically transfer an individual in Seabrook's circumstances to a DOCCS

institution, DOC had a meaningful choice to pursue a policy of seeking immediate authorization from DOCCS for the individual's release.

The second prong of the test—whether the municipality adopted a policy that represented a conscious choice by a policy maker—is met because Seabrook alleged that DOC exercised its discretion by making a conscious choice to require a physical transfer of custody to DOCCS. The DOC communications cited in Seabrook's complaint imply that DOC had a practice of requiring a physical transfer in the first instance: Seabrook's counsel was told that Seabrook could be released "[o]nce he [went] upstate" to DOCCS custody, where "his time will be calculated." App'x 22. But Seabrook was ultimately released because DOC got *authorization* from DOCCS, not because Seabrook was in fact physically transferred to DOCCS. Based on DOC's alleged conduct, DOC understood that it *could* effectuate Seabrook's release by seeking authorization from DOCCS. *See Juzumas*, 33 F.4th at 688; *Vives*, 524 F.3d at 356–57. Because DOC nevertheless initially adhered to a policy of requiring physical transfer to DOCCS of individuals held

beyond their maximum sentence, the complaint satisfies the second prong of the test.[5]

ii. Expedited Review

Moreover, no state law prevented DOC from adopting procedures to minimize the risk of over-detention, including expedited review processes for individuals who are approaching, or have passed, their maximum sentence date. DOC's failure to adopt such a policy easily satisfies the "meaningful choice" prong.

Likewise, the City's alleged failure to have *any* policy providing recourse for individuals held beyond their maximum sentence itself reflects a choice that satisfies the second "conscious choice" prong. We have recognized that "a 'city's policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the

[5] In the alternative, because, as set forth below, we conclude that Monastero was deliberately indifferent to the risk of constitutional injury, and because he is alleged to be a policymaking official due to his role as head of the Custody Management Unit, the allegations may also support municipal liability solely due to his deliberate indifference. *See Jones v. Town of East Haven*, 691 F.3d 72, 81 (2d Cir. 2012) (explaining that "[a] municipal policymaking official's deliberate indifference to the unconstitutional actions, or risk of unconstitutional actions, of municipal employees can in certain circumstances satisfy the test for a municipal custom, policy, or usage that is actionable under Section 1983," and defining deliberate indifference to require "proof that a municipal actor disregarded a known or obvious consequence of his action"). Because we conclude that City's alleged policy here satisfies *Monell*, we need not assess whether the City can be held liable based on Monastero's own deliberate indifference.

Constitution.' " *Cash v. County of Erie*, 654 F.3d 324, 334 (2d Cir. 2011) (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)).

Seabrook, in his class allegations, has alleged that so many people have been detained beyond their maximum sentence or conditional release date that joinder of all members would be impracticable, and that the number of individuals who have been unconstitutionally over-detained is "well more than 40 persons." App'x 23. He also alleges that his attorney contacted DOC officials three times over more than a two-week period to try to effectuate his release. These allegations are sufficient to suggest that DOC was on notice of recurrent constitutional violations resulting from its practices and failed to adopt a policy to ensure timely review and resolution of over-detention claims.

In sum, Seabrook has alleged that he languished at Rikers for longer than penologically required because instead of seeking immediate authorization from DOCCS for Seabrook's release, DOC held him while awaiting physical transfer to DOCCS. And instead of providing an expedited method for Seabrook to secure immediate review of his over-detention, it required his lawyer to seek ad hoc relief by reaching out to DOC officials repeatedly over the course of more than two weeks. Seabrook has plausibly alleged that these policies caused, at least in part, his over-detention. Discovery may demonstrate that DOC immediately and

diligently sought authorization from DOCCS for Seabrook's release and that the State bears sole responsibility for his over-detention. But at the pleadings stage, his allegations that the City is liable for a policy or custom pursuant to *Monell* are sufficient to survive a motion to dismiss.

*B. Claim Against Monastero*

A plaintiff must allege two elements to state an Eighth Amendment claim pursuant to 42 U.S.C. § 1983: (1) "the alleged deprivation must be, in objective terms, sufficiently serious" and (2) "the charged official must act with a sufficiently culpable state of mind." *Hurd*, 984 F.3d at 1084. Given the magnitude of the constitutional interest in "freedom of choice and movement," which has "the highest place in the spectrum of values recognized by our Constitution," our Court has explained that "unauthorized detention of just one day past an inmate's mandatory release date qualifies as a harm of constitutional magnitude" that satisfies the first prong. *Id.* at 1085. Seabrook has alleged an unauthorized detention of seventeen days and so has alleged a sufficiently serious deprivation.

To meet the second prong, a plaintiff must allege that an official acted with "a state of mind that is the equivalent of criminal recklessness." *Matzell v. Annucci*, 64 F.4th 425, 435 (2d Cir. 2023). In other words, a complaint must plead that there was a "deliberate infliction of punishment, and not an ordinary lack of due care

for prisoner interests or safety." *Hurd*, 984 F.3d at 1084; *see Farmer v. Brennan*, 511 U.S. 825, 839 (1994) (explaining that Eighth Amendment liability arises if an official "consciously disregard[s] a substantial risk of serious harm"). Officials can also be "deliberately indifferent to their own clerical errors on the basis of their refusals to investigate well-founded complaints regarding these errors." *Hurd*, 984 F.3d at 1084–85. Nevertheless, "[i]f a period of prolonged detention results from discretionary decisions made in good faith, mistake, or processing or other administrative delays, as opposed to the deliberate indifference of prison officials, then there is no Eighth Amendment liability." *Id.* at 1086.

At this stage of the litigation, Seabrook sufficiently alleges that Monastero acted with deliberate indifference. The complaint alleges that Monastero leads the Custody Management Unit, "is extensively involved in all day-to-day DOC custody management practices, decisions, and actions," and "was personally involved in the formulation and execution of the City's official policy and practice of continuing the detention of persons who already have spent more time in custody prior to their sentencings than their maximum terms of imprisonment." App'x 14–15. The complaint alleges that DOC was aware from the time of Seabrook's sentencing that he was being detained in excess of his maximum sentence, that Seabrook's counsel contacted the DOC's Office of General Counsel

and the Warden regarding his excessive detention, and that the Warden explained, copying Monastero, that the Custody Management Unit had been working to expedite the transfer from DOC to DOCCS custody required before his release. The complaint pleads that Monastero responded on the same day to explain that they were waiting on DOCCS to get authorization for Seabrook's release or transfer. Later that day, Seabrook was released.

Seabrook has therefore plausibly alleged that Monastero was aware of his excessive detention for some period prior to February 16, that Monastero was centrally involved in the Custody Management Unit's decisions and policies regarding prisoner detention, and that Seabrook was excessively detained for over two weeks. These allegations support an inference that Monastero initially sought to hold Seabrook until he could be physically transferred to DOCCS custody, but that DOC ultimately released him pursuant to DOCCS's authorization without such a transfer. Indeed, that Monastero secured Seabrook's release immediately after his supervisor copied him on the communications with Seabrook's counsel permits an even stronger inference: that despite his knowledge of Seabrook's unconstitutional detention, Monastero took no action at all before the February 16 email.

As discussed with respect to the City's alleged policies, the statutory scheme and sentencing order left room for discretion as to whether to require physical transfer or authorization and whether to create a framework for expediting release in these situations, and the complaint alleges that Monastero exercised that discretion in an unconstitutional manner. The allegations suggest that Monastero was aware of the unconstitutional detention, had the ability to address the issue sooner, and initially chose not to do so. *See Farmer*, 511 U.S. at 839 (holding that the standard requires an official to "consciously disregard a substantial risk of serious harm").

Unlike in *Hurd*, and contrary to the City's arguments, the complaint here adequately alleges that Monastero had sufficient authority and control to causally connect his actions to Seabrook's prolonged detention. *See Hurd*, 984 F.3d at 1086. First, even assuming that Monastero was required by New York law and the sentencing order to transfer Seabrook from DOC to DOCCS custody prior to his release, the complaint alleges that Monastero had the ability to expedite—or not expedite—that transfer.

Second, read holistically, the complaint alleges that Monastero knew of Seabrook's excessive detention and had the ability to seek authorization for Seabrook's release from DOCCS without requiring his physical transfer but

apparently did not do so until February 16, the day that Seabrook was released. Seabrook has therefore adequately alleged that Monastero knew that Seabrook was being deprived of his liberty without penological cause and chose not to take the available "reasonable measures to abate" that harm. *See Farmer*, 511 U.S. at 837–39, 847.

As is the case with respect to the claims against the City, discovery may show that Monastero diligently sought DOCCS authorization for Seabrook's release from the moment of Seabrook's sentencing and that, for Monastero's part (as opposed to DOCCS's), the period of excessive confinement resulted from nothing more than a good faith, administrative delay. *See Hurd*, 984 F.3d at 1086. But at the pleading stage, all reasonable inferences must be drawn in favor of Seabrook as the non-moving party, and inferring from these pleadings that Monastero was taking reasonable steps to expedite Seabrook's release would be counter to that principle. *See Knapp v. Barclays PLC*, 171 F.4th 166, 170 (2d Cir. 2026) (explaining that courts review Rule 12(b)(6) motions by "drawing all reasonable inferences in favor of the plaintiff").[6]

[6] The City argues primarily that the allegations of deliberate indifference were insufficient but argues in the alternative that Monastero was entitled to qualified immunity. Because the district court did not address the issue of qualified immunity in its order dismissing the case, we leave it

## II. Procedural Due Process

Seabrook also claims that his excessive detention violated procedural due process under the Fourteenth Amendment because he was deprived of his liberty without adequate process, as he had no means to challenge his excessive detention. The procedural due process analysis requires a two-step inquiry: first, is there "a liberty or property interest which has been interfered with by the State," and second, were "the procedures attendant upon that deprivation . . . constitutionally sufficient." *Francis v. Fiacco*, 942 F.3d 126, 141 (2d Cir. 2019). For the reasons provided below, we conclude that Seabrook has adequately alleged that he was deprived of a liberty interest and that he was denied constitutionally adequate process.

### *A. Liberty Interest*

Contrary to the district court's conclusion, DOC's delay in acting and its policies regarding transfer to DOCCS did deprive Seabrook of a cognizable liberty interest by causing at least some portion of his seventeen-day excessive detention. As a general matter, it is clearly established that "an inmate has a liberty interest

to the district court on remand to consider the application of qualified immunity in the first instance. *See Friend v. Gasparino*, 61 F.4th 77, 87 (2d Cir. 2023) (reversing a dismissal of a malicious prosecution claim and declining to address qualified immunity where the district court had not yet considered the issue because it dismissed the claim based on the presence of probable cause).

in being released upon the expiration of [the inmate's] maximum term of imprisonment." *Francis*, 942 F.3d at 142. Seabrook therefore had a liberty interest in not being detained for one day—let alone seventeen days—in excess of his sentence.

The district court held that despite this general liberty interest, the fault lay with the state court's sentencing order and not with DOC's actions and policy. Because the order declared that Seabrook was committed to DOCCS custody and required that DOC deliver him to DOCCS, the court reasoned that DOC had no role in the excessive detention other than a ministerial implementation of that sentencing order, which meant that DOC could do nothing other than wait to physically transfer Seabrook.

As we have explained in relation to the Eighth Amendment claims, it's not true that DOC lacked discretion under the statutory scheme and sentencing order. The choice to await DOCCS's agreement for a physical transfer, and then, only when repeatedly pushed by Seabrook's counsel, to seek authorization from DOCCS for Seabrook's release illustrates that DOC in fact did have a choice in how it implemented the sentencing order. And, as set forth above, the absence of any established process for expedited review for individuals who have served their maximum sentence left Seabrook to rely on ad hoc communications to DOC

officials to secure his release. Any inference that DOC and Monastero took reasonable measures to expedite the process would be improper at this stage of litigation, given the facts alleged regarding the repeated communications with DOC, DOC's awareness of the problem, and the length of delay.

*Francis* is not to the contrary. There, a sentencing order mandated a concurrent sentence but prison officials instead implemented it as a consecutive sentence based on their own interpretation of New York law, which resulted in Francis's prolonged detention and deprived him of his liberty. *Id.* at 142. While the district court here is correct that the *Francis* issue arose because officials deviated from the sentencing order, that does not mean that DOC's implementation of the order at issue here absolves it of constitutional violations that order did not mandate. Even assuming the sentencing order contemplated sending Seabrook to Rikers for a brief period, the complaint alleges that *DOC's* alleged policy and practice led to a multi-week delay here. Further factfinding is needed to understand what exactly DOC was doing during those weeks and where the fault may ultimately lie. But it cannot be said on these allegations that DOC played no role in depriving Seabrook of his liberty.

*B. Process*

Given that Seabrook adequately alleged that the City caused a deprivation of his liberty, the next question is what process was constitutionally required. "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Francis*, 942 F.3d at 142. Understanding what a particular situation demands requires us to apply the three-part balancing from *Mathews v. Eldridge*, looking to (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 U.S. 319, 335 (1976).

The private interest here, as noted in *Francis*, is Seabrook's interest in his "timely release from prison." *Francis*, 942 F.3d at 143. That is "the most elemental of liberty interests—the interest in being free from physical detention by one's own government." *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004). Seabrook thus has a private interest of the utmost strength at stake.

The risk of erroneous deprivation, especially when combined with the strength of the private interest at issue, is high, and additional procedural

safeguards would likely have had significant value. Again, like in *Francis*, sentencing and detention are delineated by a complex statutory scheme. 942 F.3d at 143. But that scheme leaves open how situations like this should be handled. Seabrook alleges that there is no established process for individuals who know their maximum sentence has expired during pre-trial detention to quickly secure DOC review of and response to their unconstitutional over-detention. The lack of process and protections greatly enhances the risk of excessive detention.

Additional procedures would likely reduce the risk of erroneous deprivation by creating a mechanism to identify individuals who have served their maximum sentence and to expedite their release. Seabrook has alleged that "[t]here is no meaningful way for a person in this situation to alert DOC that he or she already has served more than his or her maximum sentence and trigger a review process that leads to prompt release." App'x 11. At this early stage of litigation, further record development is needed to understand what procedures were available to Seabrook beyond the ad hoc and largely ineffective communications with DOC that are alleged in the complaint. But on the pleadings, Seabrook has alleged that there is no process within DOC's control that would have minimized the risk of this serious deprivation of liberty or would have shortened the duration of the deprivation. It is also likely that sufficient

procedures would not necessarily require an administrative hearing or other formal adjudication. Rather, they could consist of administrative processes for promptly bringing claims of over-detention to the attention of the appropriate DOC official coupled with prescribed DOC procedures and timelines for investigating and resolving the complaints.

The district court and the City in its briefing focused on the fact that Seabrook's counsel was able to raise the issue at his sentencing hearing, but the pre-detention discussion at the sentencing hearing did not provide sufficient process for addressing the over-detention once Seabrook was committed to DOC. Nothing in the sentencing order deprived DOC of its discretion to take reasonable steps to ensure Seabrook's timely release. While it's possible that different arguments at sentencing could have led to a different order, and thus may have altogether avoided Seabrook's reincarceration, that raises a separate issue from Seabrook's allegations that DOC's actions prolonged the excessive detention and that Seabrook had no effective means to prompt DOC to effectuate his timely release.

The third factor, the governmental interest and any burden imposed by additional or substitute process, does not outweigh the first two factors. The City argues that "DOC has a substantial interest in routine administration and the

ministerial execution of straightforward sentencing orders from state sentencing courts." Appellees' Br. at 42. It is true that the governmental function of DOC's implementation of a sentence is "essentially ministerial," but that "makes the addition of extra levels of procedure particularly feasible." *Francis*, 942 F.3d at 144. Consistent with DOC's administrative role in this process and contrary to the district court's reasoning that additional adjudication would be burdensome, the process required would not necessitate an onerous second-guessing of the sentencing order. It would likely consist of an administrative mechanism to flag instances of excessive detention and establish a timely process for DOC to secure authorization for an individual's release—an ability that its alleged actions indicate it has. Thus, "the fiscal or administrative burdens that the government will sustain as a result of this additional process are at most negligible." *Id.* at 145.

The City also argues that Seabrook's liberty deprivation arose from a "clear case of routine administrative delay," and is thus not actionable. Appellees' Br. at 43 (quoting *Kuck v. Danaher*, 600 F.3d 159, 167 (2d Cir. 2010)). But the authority upon which the City relies for that proposition in fact supports the opposite conclusion.

*Kuck v. Danaher* concerned a procedural due process claim arising from the renewal of a firearm permit that was delayed for eighteen months while the

permit-seeker waited for an administrative appeal hearing. 600 F.3d at 163. There, the Court held that the first two factors of the *Mathews* analysis weighed in favor of a due process violation. *Id.* at 165–66. For the third factor, the Court reasoned that "the state's legitimate interest in public safety does little to explain why it requires up to twenty months to address appeals" and that, to satisfy the due process analysis, "the state must articulate some reason, tied to this interest, that justifies the lengthy period necessary to resolve these appeals." *Id.* at 166. The state's justification was that the board's backlogged caseload necessitated that timeline, but "the pleadings themselves d[id] not support a clear case of routine administrative delay or overburdened bureaucracy," as there were no allegations about the time needed to gather evidence, investigate, or adjudicate the appeal to evaluate the reasonableness of that justification. *Id.* at 166–67. As a result, and despite our Court's tendency to be "solicitous of governmental interests, particularly those related to the public's safety," the Court concluded that the complaint stated a claim. *Id.* at 167.

Similar reasoning applies to Seabrook's complaint. The complaint alleges that DOC knew—even prior to sentencing—that Seabrook had served more than his maximum sentence, and it alleges that there was an excessive, weeks-long delay in his release. Nothing in the complaint pleads Seabrook out of court by

suggesting that there were reasonable administrative justifications for the length of delay. Rather, the pleaded communications reflect that DOC told Seabrook that a transfer was required, but that DOC later secured Seabrook's immediate release by requesting authorization from DOCCS. Though discovery may reveal that there was nothing more DOC could have done to expedite the process, deciding that issue in DOC's favor at this stage of litigation would draw impermissible inferences against Seabrook.

In sum, on the basis of Seabrook's allegations, the *Mathews* factors favor a holding that Seabrook has plausibly alleged that DOC violated his due process rights by failing to provide sufficient procedures to mitigate the risk of excessive detention. Seabrook has a core liberty interest in freedom from unwarranted detention. Given the dearth of procedures to protect that interest, there is currently an excessively high risk of erroneous deprivation of that liberty that would likely be alleviated by some additional process. The benefit of that additional process is not outweighed by any potential burden on the government occasioned by additional procedures.

## CONCLUSION

For these reasons, we **VACATE** and **REMAND** for proceedings consistent with this opinion.